FILED

2017 Feb-09  PM 04:46
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **THOMAS CHRISTOPHER WHITE,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  2:14-CV-01702-RDP** |
| | } | |
| **WINN-DIXIE MONTGOMERY, LLC,** | } | |
| | } | |
| **Defendant.** | } | |

## <u>MEMORANDUM OPINION</u>

This case is before the court on Defendant's Motion for Summary Judgment.  (Doc. # 65).  The Motion is fully briefed and supported by the parties' evidentiary submissions.  (Docs. # 65, 67, 68, 69, 70).

Plaintiff, an African American male, alleges that Defendant discriminated based on race and retaliated against him in violation of Title VII of the Civil Rights Act of 1964, as amended, and 42 U.S.C. § 1981.  (Doc. # 7).  Plaintiff also alleges that Defendant interfered with his Family and Medical Leave Act ("FMLA") rights and retaliated against him under FMLA.  (*Id.*). Finally, Plaintiff seeks to recover overtime wages under the Fair Labor Standards Act ("FLSA"). (*Id.*).

Defendant contends that Plaintiff's discrimination claim necessarily fails because Plaintiff cannot show that a similarly situated employee outside of Plaintiff's classification was treated more favorably.  (Doc. # 67).  Furthermore, Defendant argues that Plaintiff cannot succeed on his retaliation claim because Plaintiff cannot show a causal connection between any alleged protected activity and Plaintiff's termination.  (*Id.*).  Defendant also asserts that

Plaintiff's FMLA interference claim is without merit because Plaintiff's termination was underway before Plaintiff requested FMLA leave, and he cannot establish that his termination was causally related to his request for FMLA leave. (*Id*.). Moreover, Defendant argues that Plaintiff cannot show that the stated reasons for his termination were a pretext for any unlawful motive. Finally, Defendant contends that Plaintiff's FLSA claim fails because Plaintiff was properly classified as an exempt employee under the FLSA. (*Id*.). After careful review, the court concludes that Defendant's Motion is due to be granted in full.

## I.    Relevant Undisputed Facts[1]

On April 13, 2009, Defendant hired Plaintiff as a Grocery Manager at its Store 405. (Doc. # 69-6 at p. 2). On April 15, 2010, Plaintiff was promoted to Center Store Manager at Store 595. (Doc. # 69-1 at p. 4). There he reported to Store Director Monica Sledge. (*Id.*). According to Defendant's Center Store Manager job description, Plaintiff was responsible for a number of matters: managing inventory, in-stock position, pricing integrity, and addition and deletion of product assortment; recruiting, developing, and retaining a strong workforce; managing, developing, supporting, supervising, and coaching direct reports in Grocery, Dairy and Frozen Food, and General Merchandise; coordinating, planning, and ordering seasonal and non-seasonal merchandise; ensuring shelf conditions and plan-o-gram integrity by monitoring new and discontinued items; and resolving customer complaints. (Doc. # 69-7 at pp. 7-10; Doc. # 69-10 at pp. 2-3). As a Center Store Manager, Plaintiff earned in excess of $455 per week. (Doc. # 69-1 at p. 4). According to Plaintiff, his position as Center Store Manager at Store 595

---

[1] The facts set out in this opinion are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the actual facts that could be established through live testimony at trial. *See Cox v. Admr. U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994). Asserted "facts" that are not facts at all will be disregarded. *Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 642 (11th Cir. 1998) (conclusory allegations without specific supporting facts have no probative value).

consisted of helping stock trucks, building displays, working back stock, and assisting customers. (Doc. # 70-1 at p. 2).  However, he admitted that his responsibilities as Center Store Manager also included ordering product and putting that product on the shelves; building end caps; supervising up to five employees, including stockers and grocery managers; ensuring these employees properly performed their job functions; and coaching these employees if there were problems with their performance.  (Doc. # 69-2 at p. 68).

Monica Sledge, Plaintiff's supervisor at Store 595, observed that Plaintiff exhibited performance deficiencies, including poor Center Store conditions and poor performance of Center Store employees.  (Doc. # 69-10 at p. 3).  Sledge believed these conditions were a result of Plaintiff's failure to manage, train, and properly supervise his staff.  (*Id*.).  Sledge also testified that, at times, the Assistant Store Manager would have to assist Plaintiff in completing ad displays because Plaintiff failed to complete the displays by the end of his shift.  (*Id*.). Moreover, according to Sledge, Plaintiff would frequently leave the backroom in disarray when changing a display for new advertisements. (*Id*. at pp. 3-4). Sledge also believed Plaintiff had poor time-management skills because he rarely took time to manage his departments while he completed other tasks.  (*Id.*).

On June 25, 2010, Sledge completed Plaintiff's 2010 Annual Performance Review. (Doc. # 70-1 at pp. 4-12).  Although Sledge noted that Plaintiff was new in the position and "on target" or "above target" in many areas, she also noted that Plaintiff needed improvement in various areas, including shrink, freshness, greeting and thanking customers, and offering assistance.  (*Id*. at pp. 4-5).  Sledge commented that Plaintiff "need[ed] to work with his associates to get everybody improving customer service" and he "need[ed] to help in customer

3

and general liability to improve the safety of the building." (*Id*. at pp. 5-6). In the overall summary, Sledge noted that Plaintiff was new in his position. (*Id*. at p. 12).

On July 15, 2010, Plaintiff transferred back to Store 405, where he reported to Store Director Derrick Bell. (Doc. # 69-1 at p. 4; Doc # 70 at p. 24). Bell completed Plaintiff's 2011 Annual Performance Review on November 26, 2010. (Doc. # 70-1 at pp. 14-17). Bell stated that Plaintiff was "on target," and Plaintiff received mostly complimentary reviews. (*Id*.). Bell also noted that Plaintiff "must hold all department managers who report[ed] directly to [Plaintiff] accountable for store conditions and all daily tasks." (*Id*. at p. 15). Bell also instructed that Plaintiff "must hold his Department manager and asst. dept. managers accountable. In the past year, the grocery department has [digressed] due to [lack] of leadership performed by asst. grocery managers. There is a lot of dissention and animosity amongst them to where they don't work as a team anymore." (*Id*. at p. 17). Bell stated, "[Plaintiff] must do a better job of coaching and holding the [assistant] grocery managers accountable for their performance this [fiscal] year." (*Id*.).

Around June 28, 2012, Jason Hardy became the Manager of Operational Excellence in Montgomery and eventually became the District Director of District 7 in the Montgomery Region. (Doc. # 69-1 at p. 3). Hardy was responsible for managing Stores 405, 595, and 461, and the Store Directors of each of those stores reported to him. (*Id*.). Human Resource Business Partner, Britt Pietruszewski, managed Human Resources functions at Stores 405, 595, and 461. (*Id*.). Hardy and Pietruszewski observed Store 405, while Plaintiff was there, and they found that it had performance issues. (*Id*. at 69-1 at pp. 4-5).

On April 25, 2013, Plaintiff transferred back to Store 595, where he again reported to Store Director Monica Sledge. (Doc. # 69-1 at p. 5). Plaintiff became Service Area Manager at

4

Store 595, and was responsible for managing inventory, expense control, and other operational processes; managing, developing, and evaluating a team of direct reports; overseeing and ensuring prompt, efficient, and accurate customer check-out; ensuring that the total store team delivered good customer service; addressing customer issues and complaints; ensuring that the front of the store, exterior, and parking lot were maintained; managing operations and security of company assets, including cash office procedures; and staffing and scheduling team members. (Doc. # 69-5 at pp. 6-9; Doc. # 69-10 at p. 5).  Plaintiff made in excess of $455 per week in this position.  (Doc. # 69-1 at p. 5).

Plaintiff asserts that what he did on a day-to-day basis as Service Area Manager differed from the duties listed in the job description.  (Doc. # 70 at p. 6).  However, Plaintiff admitted that he supervised employees, including Customer Service Leads and approximately five to six cashiers.  (Doc. # 69-2 at p. 37).  Plaintiff also served as Manager On Duty ("MOD").  (*Id*. at p. 38).  When serving as MOD, Plaintiff was responsible for the entire store; ten to twelve employees reported to him, and he was responsible for ensuring that all departments were closed, end caps were straightened, and the store was locked.  (*Id*.).

While Plaintiff was at Store 595, Sledge observed that Plaintiff exhibited the same performance issues she had previously noticed, and she discussed these issues with District Director Jason Hardy and HR Business Partner Britt Pietruszewski.  (Doc. # 69-10 at p. 5). Hardy and Pietruszewski maintained offices at Store 595, and when they expressed their concerns regarding the conditions of the back store room, Sledge responded that the room was in disarray because of Plaintiff's disorganization while changing display ads.  (*Id*.).  Pietruszewski suggested that Sledge place Plaintiff on a Performance Improvement Plan ("PIP"); however, Sledge was transferred to another location shortly thereafter.  (*Id*. at p. 6).  Keith Durham

replaced Sledge as the Store Director at Store 595.  (Doc. # 69-8 at p. 2). On July 22, 2014, Durham issued Plaintiff a written warning regarding the following incident: "[o]n July 21, 2013[,] [Plaintiff] was closing MOD. He neglected his duties in the following areas: customer and employee safe store conditions, cleaning of the store [and] floors, . . . [and] clearing [the parking] lot of carts."  (Doc. # 69-8 at p. 2).  Durham's action plan was to coach and train Plaintiff on proper closing procedures and normal daily store operations.  (*Id*.).

On July 25, 2013, Plaintiff transferred to Store 461 as the Service Area Manager, where he reported to Store Director Glenn Leimbach.  (Doc. # 69-1 at p. 6).  Leimbach and Plaintiff had previously worked together for two weeks at another grocery store, Bruno's.  (Doc. # 69-2 at p. 52; Doc. # 69-11 at p. 3).  Leimbach did not supervise Plaintiff's day-to-day activities at Bruno's, and was unaware that Plaintiff had filed a Charge of Discrimination against Bruno's. (*Id*.).  In Plaintiff's EEOC Charge against Bruno's, he did not identify Leimbach as having subjected him to any of the alleged discriminatory conduct.  (Doc. # 69-5 at pp. 10-13).  Plaintiff informed District Director Jason Hardy and Associate Relations Specialist Hattie Andrews that he had previously filed the charge against Bruno's.  (Doc. # 70 at p. 7).

Shane Miller, a white male, was also transferred to Store 461 as Assistant Store Director. (Doc. # 69-1 at p. 7).  As Assistant Store Director, Miller was the second-level manager, and all managers other than the Store Director reported to Miller, including Plaintiff.  (*Id*. at p. 8). Pietruszewski informed Leimbach that Miller and Plaintiff had prior performance deficiencies, and Pietruszewski proposed PIPs for Miller and Plaintiff. (*Id*.). Leimbach observed Plaintiff's and Miller's performance and noted that "[Plaintiff] failed to complete ads on time; failed to ensure proper pricing of items and removal of [outdated] items; failed to supervise his staff and ensure that staff provided excellent customer service; and failed to properly hire and schedule

associates to maintain the proper ratio of part-time to full-time employees." (Doc. # 69-11 at p. 4).  With regard to Miller, Leimbach noted that he "had difficulty effectively leading subordinates, complying with store processes, scheduling employees, and merchandising products." (*Id*.).  Leimbach issued a PIP to Miller on August 31, 2013, and he issued a PIP to Plaintiff on September 2, 2013.  (Doc. # 69-8 at p. 6; Doc. # 69-11 at p. 4).

After issuing the PIPs, Leimbach observed that Miller's performance improved, but Plaintiff's performance declined.  (Doc. # 69-11 at p. 5).  On September 18, 2013, Leimbach gave Plaintiff a list of items that needed Plaintiff's immediate attention. (Doc. # 69-8 at p. 7).  Leimbach stated that he felt Plaintiff should have already taken initiative to complete the items on the list, but Plaintiff had failed to do so.  (Doc. # 69-1 at p. 6).

Winn-Dixie uses Fresh Check audits to ensure that stores maintain fresh product, and the audits are performed by a corporate auditor.  (Doc. # 69-11 at p. 6).  During a Fresh Check audit, the auditor checks for out-of-date product, temperature holdings, and pest infestations.  (Doc. # 69-3 at p. 18). On October 14, 2013, a Fresh Check audit was performed at Store 461, and the store failed the audit due to two critical violations in the Meat Department.  (Doc. # 69-11 at p. 7).  Plaintiff had been the MOD the night before the audit, and as MOD, Plaintiff was responsible for ensuring that all departments were properly cleaned and closed and out-of-date product was removed from the shelves.  (*Id*.).  Because of the violations, on October 18, 2013, Leimbach issued Plaintiff a Written Warning Corrective Action Plan, which stated that the Meat department had not been properly cleaned the night before the Fresh Check audit, Plaintiff had not checked out the teammate,[2] the market saw had not been broken down and cleaned, and temp logs were incomplete.  (Doc. # 69-8 at p. 8).  Leimbach inspected the store again on October 18,

---

[2] Although the parties have not made clear exactly what this phrase means, the court understands that Plaintiff failed to comply with some aspect of store or shift procedures.

2013, and discovered out-of-date seafood product and chicken.  (Doc. # 69-11 at 7).  Once again, Plaintiff had been the MOD the previous night, and Leimbach stated that the out-of-date product was clearly visible and should have been discovered upon a proper inspection.  (*Id*.).  As a result, on October 18, 2013, Leimbach issued Plaintiff a Final Written Warning Corrective Action Plan.  (Doc. # 69-8 at p. 9).

In addition, Leimbach noted that Plaintiff scheduled part-time associates over the maximum twenty-four hours per week.  (Doc. # 69-11 at p. 8).  Leimbach and Pietruszewski began discussing whether Plaintiff should be discharged in late October 2013, and both agreed that termination of his employment was appropriate.  (Doc. # 69-1 at p. 10; Doc. # 69-11 at p. 8).  Pietruszewski began preparing Plaintiff's Termination Corrective Action around November 3, 2013.  (Doc. # 69-1 at p 10).

Shortly thereafter, on November 3, 2013, Plaintiff signed the Meat Department's Daily Closing List indicating that all closing procedures were completed, but Leimbach found that meat was left in the sink and that the meat saw and grinder were not properly cleaned.  (Doc. # 69-11 at p. 8).  Leimbach stated that he counseled Plaintiff and documented the counseling.  (Doc. # 69-8 at p. 10; Doc. # 69-11 at p. 8).  However, Plaintiff states that the procedures were completed and he denies having received the counseling or the document.  (Doc. # 69-2 at p. 48; Doc. # 70 at p. 9).

On November 7, 2013, Plaintiff filed a Charge of Discrimination with the EEOC alleging that he had filed a prior Charge against his former employer and Leimbach, and that Defendant retaliated against him by placing him on a PIP, not allowing him breaks, and scheduling him to work more closing shifts than other managers.  (Doc. # 69-1 at pp. 15-160).  Pietruszewski and

Leimbach testified by affidavit that they were unaware of this Charge prior to Plaintiff's filing of the present suit. (Doc. # 69-1 at p. 11; Doc. # 69-11 at p. 11).

Leimbach was out of the office on the afternoon of November 12, 2013. (Doc. # 68-4 at ¶ 20). Upon his return, Leimbach reviewed video of the store's operations and discovered unusually long check-out lines on the day before. (Doc. # 68-4 at ¶ 20). Leimbach questioned the cashiers and baggers regarding why the lines were so long, and the cashiers told him that they had asked Plaintiff for assistance, but he failed to assist because he was in the back room watching a basketball game. (Doc. # 68-4at ¶ 20). Plaintiff concedes that he was in the back room at the time and that he was looking at his iPad. (Doc. # 69-2 at 51:12-57:19). Plaintiff also admits that employees are not permitted to play on an iPad while working. (Doc. # 69-2 at 59:24-60:1).

On November 13, 2013, Leimbach counseled Plaintiff that it was inappropriate for Plaintiff to watch and/or listen to sports on his iPad behind the service desk while he was MOD and that Plaintiff had to set the example of service for front-end associates. (Doc. # 69-11 at p. 9). On November 14, 2013, Plaintiff called Winn-Dixie's Involved Associate Line ("W-DIAL") and reported that Leimbach was harassing and mistreating him. (Doc. # 69-5 at pp. 1-3). Associate Relations Specialist Hattie Andrews received the complaint for investigation. (*Id.*). On November 16, 2013, Pietruszewski completed Plaintiff's Termination Corrective Action, but he was directed to delay terminating Plaintiff while Plaintiff's W-DIAL complaint was investigated. (Doc. # 69-1 at p. 11).

Plaintiff took leave from December 19, 2013 through December 27, 2013. (Doc. # 69-3 at pp. 27-28; Doc. # 69-9 at p. 1). On December 23, 2013, Plaintiff filed a request for FMLA leave. (*Id.*). That same day, Plaintiff received an electronic copy of the FMLA packet, and Plaintiff was

informed that he had twenty-one days to return the completed Medical Certification form and that it would take five to seven business days to process Plaintiff's certification. (Doc. # 69-9 at p. 2). In late December 2013, Plaintiff's W-DIAL complaint investigation was completed, and Pietruszewski received approval to terminate Plaintiff's employment; however, Plaintiff was on leave at that time, and District Director Jason Hardy was on vacation when Plaintiff returned to work. (Doc. # 69-1 at p. 11). Plaintiff returned his Medical Certification for his FMLA request on January 1, 2014, and was aware it would take five to seven business days to process his request. (Doc. # 69-3 at pp. 26-27). Thereafter, Hardy returned to work, and during a meeting, Hardy and Pietruszewski terminated Plaintiff's employment effective January 4, 2014. (Doc. # 69-1 at p. 11).

## II.      Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. Once the moving party has met its burden, Rule 56(c) requires the non-moving party to go beyond the pleadings and – by pointing to affidavits, or depositions, answers to interrogatories, and/or admissions on file – designate specific facts showing that there is a genuine issue for trial. *See id.* at 324.

10

The substantive law will identify which facts are material and which are irrelevant.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("*Anderson*").  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant.  *See Allen v. Bd. of Pub. Educ. For Bibb Cty.*, 495 F.3d 1306, 1314 (11th Cir. 2007); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine, "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

When faced with a "properly supported motion for summary judgment, [the non-moving party] must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997).  As *Anderson v. Liberty Lobby, Inc.*, teaches, under Rule 56(c) a plaintiff may not simply rest on her allegations made in the complaint; instead, as the party bearing the burden of proof at trial, she must come forward with at least some evidence to support each element essential to her case at trial. *See Anderson*, 477 U.S. at 252.  "[A] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [her] pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.'" *Id.* at 248 (citations omitted).

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.  "Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative." *Sawyer v. Southwest Airlines Co.*, 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (citing *Anderson*, 477 U.S. at 250-51).

11

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.  "Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Sawyer*, 243 F. Supp. 2d at 1262 (quoting *Anderson*, 477 U.S. at 251-52); *see also LaRoche v. Denny's, Inc.*, 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999) ("The law is clear . . . that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment.").

## III.   Analysis

After addressing each of Plaintiff's claims, in turn, the court concludes that Defendant's Motion is due to be granted.  The court explains its reasons below.

### A.   Plaintiff Has Failed to Establish a *Prima Facie* Case of Race Discrimination[3]

Absent direct evidence of racial discrimination (of which there is none in the Rule 56 record), Title VII and Section 1981 claims are evaluated according to the burden-shifting framework developed by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973).  *Bryant v. Jones,* 575 F.3d 1281, 1307 (11th Cir. 2009).  Although the *prima facie* elements are flexible to accommodate the presentation of different types of claims in different contexts, generally a plaintiff meets his initial burden of establishing a *prima facie* case of race discrimination by presenting evidence that (1) he belongs to a racial minority, (2) he suffered an adverse job action, (3) his employer treated similarly situated employees outside of his classification in a more favorable manner, and (4) he was qualified for the job in question. *Holifield v. Reno,* 115 F.3d 1555, 1562 (11th Cir. 1997) (citing *McDonnell Douglas Corp. v.*

---

[3] Plaintiff's Title VII and § 1981 claims will be analyzed together because claims under those statutes "have the same requirements of proof and use the same analytical framework." *Standard v. A.B.E.L. Servs., Inc.,* 161 F.3d 1318, 1330 (11th Cir.1998).

*Green,* 411 U.S. 792 (1973)).  If the plaintiff makes such a showing, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *McDonnell Douglas,* 411 U.S. at 802; *Chapman v. AI Transp*., 229 F.3d 1012, 1024 (11th Cir. 2000) (en banc). This burden is one of production, not persuasion, and is "exceedingly light." *Turnes v. AmSouth Bank, N.A*., 36 F.3d 1057, 1061 (11th Cir. 1994); *Perryman v. Johnson Prod. Co.*, 698 F.2d 1138, 1141 (11th Cir. 1983).  "If the employer satisfies its burden by articulating one or more reasons, then the presumption of discrimination is rebutted, and the burden of production shifts to the plaintiff to offer evidence that the alleged reason of the employer is a pretext for illegal discrimination."  *Wilson v. B/E Aeorospace, Inc.,* 376 F.3d 1079, 1087 (11th Cir. 2004).

Plaintiff argues that he has established his *prima facie* case of race discrimination by showing that he was treated less favorably than his Caucasian supervisor, Shane Miller, when (1) they were both placed on a Performance Improvement Plan ("PIP") and (2) thereafter Plaintiff was terminated for performance problems, but Miller was not.

Elements one, two, and four of Plaintiff's *prima facie* case are not at issue here.  But the question remains has Plaintiff failed to satisfy the third element because he has not shown that Defendant treated him less favorably than similarly situated persons outside of his protected class.  The court addresses that particular issue below.

"To make a comparison of the plaintiff's treatment to that of non-minority employees, the plaintiff must show that he and the employees are similarly situated *in all relevant aspects.*" *Holifield,* 115 F.3d at 1562 (emphasis added).  In a case comparing work rule violations, the "quantity and quality of the comparator's misconduct must be nearly identical."  *Stone & Webster Const., Inc. v. U.S. Dep't of Labor*, 684 F.3d 1127, 1135 (11th Cir. 2012) (citations

omitted).  "We ask whether the comparator is involved in the same or similar conduct as the plaintiff yet disciplined in a different way."  *Id.*  That is, "[t]he comparator must be nearly identical to [Plaintiff] to prevent courts from second-guessing a reasonable decision by the employer."  *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1091 (11th Cir. 2004) (citing *Silvera v. Orange County Sch. Bd.*, 244 F.3d 1253, 1259 (11th Cir. 2001)).  "If a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination is present."  *Holifield,* 115 F.3d at 1562 (emphasis omitted).

Plaintiff's assertion that Miller is an appropriate comparator is simply off the mark. Plaintiff supervised some employees, including Customer Service Leads and approximately five to six cashiers and served as MOD.  (Doc. # 69-2 at p. 37-38).  When serving as MOD, Plaintiff was responsible for the entire store. That is, ten to twelve employees reported to him, and he was responsible for ensuring that all departments were closed, end caps were straightened, and the store was locked.  (*Id.*).  Miller, on the other hand, was an Assistant Store Director.  (Doc. # 69-1 at p. 7).  In that position, Miller was the second-level manager, and all managers (other than the Store Director) reported to Miller, including Plaintiff.  (*Id.* at p. 8).

As a general rule, a supervisor and subordinate hold different jobs and perform different duties.  Consequently, except in unique circumstances (not present here) it cannot be said they are "similarly situated in all respects."  *Holifield*, 115 F.3d at 1562; *see also Crosby v. Computer Science Corp.*, 470 Fed. App'x. 307, 309 (5th Cir. 2012) (a plaintiff's supervisor is not a "valid comparator"); *see also Gilley v. Kelly & Picerne, Inc.*, 2016 WL 814885, at *9 (M.D. Ala. Feb. 29, 2016) (same).  Moreover, in support of his overtime claim, Plaintiff has argued that, although his job description listed him as a manager, he did not perform the listed job duties on a daily basis.  (Doc. # 74 at 13).  Perhaps Plaintiff intended this assertion to give him some help on his

FLSA claims (which are addressed fully below). But it certainly undercuts his argument that he and Miller were similarly situated.  There is no dispute that Miller was an Assistant Store Director with supervisory responsibility over Plaintiff and others. Therefore, Miller is not an appropriate comparator because he and Plaintiff were not similarly situated in all relevant respects.

Moreover, the Rule 56 evidence does not show that Miller engaged in misconduct similar to that committed by Plaintiff after being placed on a PIP.  Leimbach placed both Plaintiff and Miller on PIPs at about the same time.  Thereafter, Leimbach noticed an improvement in Miller's performance.  However, as to Plaintiff, on October 14, 2013, the night after Plaintiff was the MOD (and was responsible for ensuring that all departments were properly cleaned and closed and out-of-date product was removed from the shelves), the store failed a Fresh Check audit because of two critical violations in the Meat Department.  (Doc. # 69-11 at p. 7).  Plaintiff had not checked out the teammate, the market saw had not been broken down and cleaned, and temp logs were incomplete.  (Doc. # 69-8 at p. 8).  A few days after issuing Plaintiff a written warning for this incident, Leimbach again inspected the store after Plaintiff had been MOD and discovered out-of-date seafood product and chicken.  (Doc. # 69-11 at 7).  And, on November 11, 2013, Plaintiff was found to have been on this iPad in the back rather than helping cashiers with long check-out lines in the store.  No evidence has been presented which shows that Miller committed any such policy violations after being placed on PIP.  Therefore, even if Miller were otherwise a proper comparator (which he is not), Plaintiff has failed to establish that Miller engaged in a nearly identical quantity and quality of misconduct after being placed on a PIP. Because Plaintiff has not shown that he was treated less favorably than similarly situated person

outside of his protected class, he has failed to establish the third element of a *prima facie* case of discrimination.

### B.       Plaintiff Has Failed to Establish a *Prima Facie* Case of Retaliation

Title VII prohibits an employer from retaliating against an employee "because he has opposed any practice made an unlawful employment practice," including discrimination on the basis of race.  42 U.S.C. § 2000e-3(a).  To establish a prima facie case of retaliation, Plaintiff must show: (1) he engaged in protected activity or expression; (2) he suffered an adverse employment action; and (3) the adverse employment action was causally connected to the protected conduct.[4]  *See Harper v. Blockbuster Entm't Corp.*, 139 F.3d 1385, 1388 (11th Cir. 1998); *see also Tipton v. Canadian Imperial Bank of Commerce*, 872 F.2d 1491, 1494 (11th Cir. 1989).  In the context of a retaliation claim, where proof of retaliatory intent is offered by way of circumstantial evidence, courts apply a burden-shifting scheme akin to the *McDonnell Douglas* framework.  If the plaintiff makes out a prima facie case of retaliation, the burden shifts to the employer to articulate a legitimate reason for the adverse employment action.  *Sullivan v. Nat'l R.R. Passenger Corp.*, 170 F.3d 1056, 1059 (11th Cir. 1999).  If the employer proffers a legitimate reason, the burden shifts back to the employee to show that the legitimate reason was pretext for prohibited retaliatory conduct.  *Id.*  The plaintiff can demonstrate pretext by exposing "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the defendant's reasoning.  *Springer v. Convergys Customer Mgmt. Grp. Inc.*, 509 F.3d 1344, 1348 (11th Cir. 2007).

There is no dispute that Plaintiff engaged in protected conduct.  Shortly before his termination, he filed an EEOC charge.  There is also no dispute that he suffered an adverse

---

[4] The elements required to establish retaliation claims under § 1981 are the same as those required for Title VII claims.  *See Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1277 (11th Cir. 2008).

employment action.  His employment was terminated.  The issue in this case is whether Plaintiff has established a causal connection between these two events.  "In order to establish the requisite 'causal link' required as part of a *prima facie* case, a plaintiff need only establish that 'the protected activity and the adverse action were not wholly unrelated.'"  *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993); *see also Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000).    A substantial delay between the protected activity and the negative employment action, where there is no other evidence of causation, is insufficient to establish a causal connection.  *See Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001).  Conversely, "[a] plaintiff may satisfy her burden of proving causation by demonstrating a 'close temporal proximity between the statutorily protected activity and the adverse employment action.'"  *Luke v. Bd. of Trustees Florida A&M Univ.*, 2016 WL 7404677 at *3 (11th Cir. Dec. 22, 2016) (quoting *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007)).  However, while close temporal proximity can be effective to raise an inference of causation, if that is the only basis of causation, "the actions must be very close in time."  *United States ex rel. Salters v. American Family Care, Inc.*, 2016 WL 7242180 at *6 (N.D. Ala. Dec. 15, 2016) (citing *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)). A lapse in time of several months, in the absence of other evidence tending to show causation, is insufficient.  *See Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004).

The only admissible evidence in the Rule 56 record regarding the initiation of termination proceedings comes from the declarations of Leimbach and Pietruszewski. They both attested to the fact that they began discussions regarding terminating Plaintiff's employment in late October 2013 due to increasing concerns regarding his performance and they agreed at that time that Plaintiff should be terminated. Pietruszewski's declaration also establishes that he began

17

preparing Plaintiff's termination documents on November 3, 2013. Notably, this was the same date that plaintiff improperly signed off on the Meat Department's Daily Closing List indicating that all closing procedures were completed, when in fact they were not. Moreover, Pietruszewski and Leimbach both testified that they were not aware of Plaintiff's EEOC Charge at the time they were preparing termination documents, or even prior to the filing of the present suit. (Doc. # 69-1 at p. 11; Doc. # 69-11 at p. 11).

Plaintiff has presented no evidence that Leimbach and Pietruszewski were aware of Plaintiff's EEOC charge at the time they initiated termination proceedings. Indeed, "Title VII's anti-retaliation provisions do not allow employees who are already on thin ice to insulate themselves against termination or discipline by preemptively making a [ ] complaint." *Alvarez*, 610 F.3d at 1270. And, this is particularly true when the decision makers do not know of the purported protected activity. Plaintiff speculates that Leimbach and Pietruszewski were not the decision makers regarding his termination.  And he has accused Defendant of fabricating the termination documents. But there is no evidence in the Rule 56 record to support that theory. Plaintiff has presented nothing more than conclusory statements and speculation in response to Defendant's properly supported Motion for Summary Judgment.  But "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Bald Mountain Park, Ltd. v. Oliver*, 863 F.2d 1560, 1563 (11th Cir. 1989)); *see also Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 642 (11th Cir. 1998) (conclusory allegations without specific supporting facts have no probative value); *Broadway v. City of Montgomery, Ala*., 530 F.2d 657, 660 (5th Cir. 1976) (conclusory statements, unsubstantiated by facts in the record, will normally be insufficient to defeat a motion for summary judgment). Based on the Rule 56 record

before the court, there is nothing actually or genuinely in dispute for a jury to decide. Plaintiff

has failed to establish the causation element of his *prima facie* case.

### C.      Defendant's Legitimate, Non-discriminatory and Non-retaliatory Reasons

On October 14, 2013, when Plaintiff was already on PIP, a Fresh Check audit performed

after Plaintiff had been MOD the night before found that the Meat department had not been

properly cleaned, Plaintiff had not checked out the teammate, the market saw had not been

broken down and cleaned, and temp logs were incomplete.  (Doc. # 69-8 at p. 8).  Because of

these violations, on October 18, 2013, Leimbach issued Plaintiff a Written Warning Corrective

Action Plan. (*Id.*). Leimbach also inspected the store on October 18, 2013, when Plaintiff had

again been the MOD the previous night, and discovered out-of-date seafood product and

chicken.  (Doc. # 69-11 at 7).  The out-of-date product was clearly visible and should have been

discovered upon a proper inspection.  (*Id*.).  As a result, on October 18, 2013, Leimbach issued

Plaintiff a Final Written Warning Corrective Action Plan.  (Doc. # 69-8 at p. 9). Leimbach also

noted that Plaintiff scheduled part-time associates over the maximum twenty-four hours per

week.  (Doc. # 69-11 at p. 8).

Leimbach and Pietruszewski began discussing Plaintiff's termination in late October

2013, and both agreed that termination was appropriate.  (Doc. # 69-1 at p. 10; Doc. # 69-11 at p.

8).  Pietruszewski began preparing Plaintiff's Termination Corrective Action around November

3, 2013.  (Doc. # 69-1 at p 10). On November 3, 2013, Plaintiff signed the Meat Department's

Daily Closing List indicating that all closing procedures were completed, but Leimbach found

that meat was left in the sink and that the meat saw and grinder were not properly cleaned.  (Doc.

# 69-11 at p. 8).  And, about a week later, it came to light that Plaintiff was in the back on his

iPad rather than supervising the store while long line lines formed at cashier stations. In light of

this undisputed Rule 56 evidence, the court has no hesitation in finding that Defendant has easily

met its "exceedingly light" burden of articulating a legitimate, non-discriminatory and non-retaliatory reason for Plaintiff's discharge.

### D.   Plaintiff Has Failed to Establish that Defendant's Articulated Reasons are Pretextual

Even if Plaintiff were able to establish a *prima facie* case of either race discrimination or retaliation (which he cannot), his Title VII and Section 1981 claims nevertheless fail because he is unable to show that the reasons given for Defendant's decision to place Plaintiff on a PIP and subsequently terminate his employment were a pretext for race discrimination and/or retaliation. "[T]o avoid summary judgment [the plaintiff] must introduce significantly probative evidence showing that the asserted reason is merely a pretext for discrimination." *Clark v. Coats & Clark, Inc.,* 990 F.2d 1217, 1228 (11th Cir. 1993) (citations omitted).  A reason is not pretext for discrimination or retaliation "unless it is shown both that the reason was false, and that discrimination [or retaliation] was the real reason." *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 515 (1993).

To establish pretext, a plaintiff cannot recast the proffered reason, but must meet it head on and rebut it.  *Holland v. Gee*, 677 F.3d 1047, 1055 (11th Cir. 2012).  The plaintiff must show "weaknesses, implausibilties, inconsistencies, incoherencies, or contradictions in the employer's rationale."  *Id.* at 1055-56 (quotation omitted).  The inquiry into pretext centers on the employer's beliefs, not the employee's beliefs or "reality as it exists outside of the decision maker's head." *Alvarez v. Royal Atlantic Developers, Inc.,* 610 F.3d 1253, 1266 (11th Cir. 2010). As noted by the Eleventh Circuit in *Damon v. Fleming Supermarkets of Florida, Inc.,* "[courts] are not in the business of adjudging whether employment decisions are prudent or fair. Instead our sole concern is whether unlawful discriminatory [or retaliatory] animus motivates a challenged decision." 196 F.3d 1354, 1361 (11th Cir. 1999).

20

Plaintiff's argument that Defendant's articulated reasons are pretextual boils down to his disagreement with Defendant's assessment of his performance.  However, this argument suffers from two fatal flaws. First, a plaintiff's perception of his own performance and abilities is irrelevant to a pretext inquiry which centers upon the employer's beliefs, and not the employee's own perceptions of his performance. *Holifield*, 115 F.3d at 1565. Second, the evidence shows that Plaintiff had the same ongoing performance issues, including failure to properly oversee and manage his employees, from April 2010 until his termination.  These same deficiencies (or, at the very least, similar ones) were observed by two African American Store Directors (Sledge and Bell) long before Plaintiff's termination.  Tellingly, although Plaintiff admits that he was aware of the duties listed in the job description, he also readily contends that he did not perform those duties on a day-to-day basis.  (Doc. # 70 at p. 6).  As noted above, this may support of his overtime claim, but it dovetails with the legitimate, non-discriminatory/non-retaliatory reasons given by Defendant for his termination.  Plaintiff has simply failed to show that Defendant's articulated, non-discriminatory and non-retaliatory reasons for the termination decision were false and that discrimination or retaliation was the real reason for the termination.  *See Brooks v. County Comm'n of Jefferson County, Ala.*, 446 F.3d 1160, 1163 (11th Cir. 2006). Therefore, Defendant is entitled to summary judgment on Plaintiff's discrimination and retaliation claims.

### D.    Defendant is Entitled to Summary Judgment on Plaintiff's FMLA Interference and Retaliation Claims

The FMLA creates two types of claims: (1) interference claims, in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the Act; and (2) retaliation claims, in which an employee asserts that his employer discriminated against him because he engaged in activity protected by the Act. *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1293 (11th Cir. 2006) (quotations and citation omitted); *see also* 29

21

U.S.C. § 1615(a)(1), (2).  In order to state a claim for FMLA interference, "a plaintiff need only demonstrate that he was entitled to but denied [a substantive FMLA] right.  He does not have to [show] that his employer intended to deny the right; the employer's motives are irrelevant." *Strickland v. Water Works & Sewer Bd. of Birmingham,* 239 F.3d 1199, 1208 (11th Cir. 2001). However, "the right to commence FMLA leave is not absolute, and [] an employee can be dismissed, preventing [him] from exercising [his] right to commence FMLA leave, without thereby violating the FMLA, if the employee would have been dismissed regardless of any request for FMLA leave."  *Krutzig v. Pulte Home Corp.*, 602 F.3d 1231, 1236 (11th Cir. 2010).

In *Krutzig*, and in the context of a FMLA interference claim, the Eleventh Circuit addressed whether the right to commence FMLA leave is absolute. 602 F.3d at 1236. The *Krutzig* court held that "the right to commence FMLA leave is not absolute, and that an employee can be dismissed, preventing her from exercising her right to commence FMLA leave, without thereby violating the FMLA, if the employee would have been dismissed regardless of any request for FMLA leave." *Krutzig,* 602 F.3d at 1236. Thus, the key question here is *why* was Plaintiff terminated.  If there is no retaliatory motive, Defendant's termination was lawful because an employee who requested FMLA leave, if then discharged from work, and who would have otherwise been discharged, cannot claim FMLA interference. Consequently, here, Plaintiff's two FMLA claims essentially merge into one claim which is virtually the same as his retaliation claim under Title VII and Section 1981. His claim sounds in retaliation, not interference.

"The prima facie case of retaliation under the FMLA is the same as under Title VII and requires a showing of (1) statutorily protected conduct, (2) adverse employment action, and (3) causation." *Penaloza v. Target Corp.,* 549 Fed. App'x. 844, 847-48 (11th Cir. 2013) (citing

22

*Krutzig*, 602 F.3d at 1234-35). Again, however, just as with his Title VII claim, Plaintiff cannot demonstrate causation. Temporal proximity between the protected activity and the adverse action alone generally cannot show causation when the employer has contemplated the adverse action before the protected activity takes place. *See Quigg v. Thomas Cty. Sch. Dist.*, 814 F.3d 1227, 1245 (11th Cir. 2016) (concluding that "no triable issue of causation exists" in retaliation claim when school district raised ethics concerns prior to administrator's protected activity, even though formal ethics complaint was filed afterwards); *see also Drago v. Jenne*, 453 F.3d 1301, 1308 (11th Cir. 2006) ("[I]n a [Family and Medical Leave Act] retaliation case, when an employer contemplates an adverse employment action before an employee engages in protected activity, temporal proximity between the protected activity and the subsequent adverse employment action does not suffice to show causation.")

Also, as previously explained with respect to Plaintiff's retaliation claim under Title VII and Section 1981, even if Plaintiff had satisfactorily demonstrated a causal connection between his request for FMLA leave and his termination, Defendant has proffered legitimate, non-discriminatory and non-retaliatory reasons for Plaintiff's termination.  And, as also discussed above, Plaintiff has failed to rebut these reasons or show that they are a pretext for an unlawful motive.  This same analysis and conclusion apply here. Therefore, just like its Title VII and Section 1981 counterparts, Plaintiff's FMLA claims necessarily fail.  Defendant is entitled to summary judgment on these claims.

### E.     Defendant is Entitled to Summary Judgment on Plaintiff's FLSA Claim

As a general rule, the FLSA provides that employees are entitled to receive overtime pay at one and one-half times their regular rate for all hours worked in excess of forty per week.  *See* 29 U.S.C. § 207(a)(1).  But the FLSA exempts from its overtime pay requirements "any

employee employed in a bona fide executive, administrative, or professional capacity." *See* 29 U.S.C. § 213(a)(1).  The exemption is an affirmative defense, and the employer has the burden to show it applies to the employee in question.  *See Jeffery v. Sarasota White Sox, Inc.,* 64 F.3d 590, 594 (11th Cir. 1995).  "The statute of limitations for claims seeking unpaid overtime wages generally is two years, but if the claim is one 'arising out of a willful violation,' another year is added to it." *Alvarez Perez v. Sanford–Orlando Kennel Club, Inc.,* 515 F.3d 1150, 1162 (11th Cir. 2008) (quoting 29 U.S.C. § 255(a)).  "To establish that the violation of the Act was willful in order to extend the limitations period, the employee must prove by a preponderance of the evidence that his employer either knew that its conduct was prohibited by the statute or showed reckless disregard about whether it was."  *Id.* at 1162–63 (citing *McLaughlin v. Richland Shoe Co.,* 486 U.S. 128, 133 (1988)).

In this case, Plaintiff's effective termination date was January 4, 2014.  Plaintiff filed his complaint on September 30, 2014 seeking overtime compensation for the last three years of his employment.  (Doc. # 7 at p. 9; Doc. # 69-1 at p. 11).  In order for Plaintiff to recover for the three year period, in addition establishing an FLSA violation, he must establish the violation was willful.

### 1.    Plaintiff Has Not Shown He Is Entitled to Overtime Compensation

To establish a *prima facie* case of liability for failure to pay overtime compensation under the FLSA, Plaintiff must demonstrate that: (1) Defendant employed him; (2) Defendant is an enterprise engaged in interstate commerce covered by the FLSA (or Plaintiff is otherwise covered under FLSA); (3) Plaintiff actually worked in excess of a 40–hour workweek; and (4) Defendant did not pay any overtime wages to him. *Morgan v. Family Dollar Stores, Inc.,* 551 F.3d 1233, 1277 n. 68 (11th Cir. 2008). A Plaintiff must establish 'as a matter of just and

reasonable inference' the amount and extent of his work in order to demonstrate that he was inadequately compensated under the FLSA." *Ekokotu v. Federal Express Corp.,* 408 Fed. App'x. 331, 340 (11th Cir. 2011) (quoting *Caro–Galvan v. Curtis Richardson, Inc.,* 993 F.2d 1500, 1513 (11th Cir. 1993)).

Plaintiff has failed to meet his initial burden of proof in this case that a violation occurred.  It is well-established that an employee who brings an action under the FLSA for unpaid overtime compensation has the initial burden of proving that he performed work for which he was improperly compensated.  *See Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680, 687–88 (1946), *superseded by statute on other grounds as stated in Carter v. Panama Canal Co.,* 463 F.2d 1289, 1293 (D.C. Cir. 1972).  The record indicates that Plaintiff worked in excess of forty hours per week; however, Plaintiff has presented no evidence whatsoever that he was improperly compensated for the work performed.  (Doc. # 70-1 at pp. 20-27).  Thus, Plaintiff has failed to carry his burden of proof as to the fourth element of his *prima facie* case.

### 2.    Plaintiff Was an Exempt Employee

Even if Plaintiff could establish that he performed work for which he was not paid overtime, his claim still fails. Plaintiff was an exempt employee when he became Service Area Manager in 2013.  An exemption from the overtime pay requirement exists for employees in a "bona fide executive, administrative, or professional capacity" as defined by FLSA regulations. 29 U.S.C. § 213(a)(1).  The Code of Federal Regulations defines executive employees as those (1) who receive compensation "of not less than $455 per week"; (2) whose "primary duty" is management of the enterprise in which the employee is employed or a customarily recognized department or subdivision thereof; (3) who customarily and regularly directs the work of two or more other employees; and (4) who has the authority to hire or fire other employees or whose

suggestions and recommendations as to the hiring, firing, advancement, promotion, or any other change of status of other employees are given particular weight. 29 C.F.R. § 541.100(a).

First, it is undisputed that Plaintiff made in excess of $455 per week, thus meeting the compensation requirement of the executive exemption. (Doc. # 69-1 at pp. 4-5). Second, Plaintiff assumed management responsibilities over his stores as a Service Area Manager. (Doc. # 69-5 at pp. 6-9; Doc. # 69-10 at p. 5). As Service Area Manager, Plaintiff also served as MOD. (*Id*. at p. 38). As MOD, he was "responsible for the whole store" and responsible for ensuring that all departments were closed, end caps were straightened, and the store was locked. (*Id*.). Third, Plaintiff regularly directed the work of two or more other employees. As Service Area Manager, Plaintiff supervised up to two Customer Service Leads and approximately five to six cashiers. (*Id*. at p. 37). Ten to twelve employees reported to Plaintiff when he served as MOD. (*Id*. at p. 38). Finally, Plaintiff had hiring authority while employed as Service Area Manager. Plaintiff reviewed applications, interviewed candidates, and scheduled interviews with Leimbach for candidates Plaintiff felt were qualified for the position. (Doc. # 69-2 at pp. 42-43).

In *Diaz v. Team Oney, Inc.,* 291 Fed. App'x. 947 (11th Cir. 2008), an assistant manager performed manual labor but was nevertheless found to be exempt. In that unpublished opinion, the court found that the managerial functions were the most important part of the job, and that the plaintiff made recommendations as to hiring and firing, conducted the first interview of applicants, and was in charge of the store for the majority of his shifts, except when the store manager was present for a few hours. *Id.* at *3. Here, Plaintiff argues that he was improperly classified as an exempt employee for overtime purposes pursuant to the FLSA because he did not perform all responsibilities listed in his job description. (Doc. # 70 at pp. 19-20). However, according to his job description, his "primary duty" was management of the store and

supervising employees.  The interesting point here is that Plaintiff was disciplined and ultimately terminated at least in part for not properly performing this "primary duty." (Doc. # 69-5 at pp. 6-9; Doc. # 69-8 at p. 9; Doc. # 69-10 at p. 5). Plaintiff was assigned management duties, including the training, coaching, and supervision of multiple employees.  Plaintiff failed to properly perform those duties resulting in his termination. However, Plaintiff's failure to properly perform his job duties simply does not remove him from the executive exemption.

Although Plaintiff contends that he spent most of his time at work performing non-management duties, "[t]ime alone ... is not the sole test" and FLSA does not require that "exempt employees spend more than 50 percent of their time performing exempt work." 29 C.F.R. § 541.700(b). Courts have found FLSA's executive exemption to apply to employees who spent the vast majority of their time performing non-exempt work. S*ee, e.g., Debrechl, Bell & Jackson v. Osceola Cnty.*, 243 F.Supp.2d 1364, 1370 n. 11, 1370–72 (M.D. Fla. 2003) (finding that the primary duty of battalion chiefs in an emergency services department was still management even though they spent 85% of their time performing non-exempt tasks); *Dipasquale v. Docutek Imaging Solutions, Inc.*, 2010 WL 4703752 (S.D. Fla. 2010) (applying the executive exemption to a service manager who testified that he spent only 10%–20% of his time performing exempt duties). Rather, management constitutes the "primary duty" of an employee when it is the "principal, main, major or most important duty that the employee performs." 29 C.F.R. § 541.700(a). On this Rule 56 record, it is clear that Defendant had both a factual and legal reason to conclude that Plaintiff's management duties were his "most important" duties.  Plaintiff's employment was terminated for not performing those duties.

Under the facts presented in the Rule 56 record, Defendant is entitled to summary judgment on Plaintiff's overtime claim under the FLSA.

**IV.    Conclusion**

For all of the reasons set forth above, Defendant's Motion for Summary Judgment (Doc.

# 65) is due to be granted.  A separate order will be entered.

**DONE** and **ORDERED** this February 9, 2017.

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE